**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| **JULIE WERNERT and SCOTT WERNERT,** as next friends for **C.W.,** )<br><br>*Plaintiffs*, )<br><br>-vs- )<br><br>**WILLIAMSON COUNTY BOARD OF EDUCATION and STACEY EDMONDSON,** in her official capacity as District Attorney for the 21st Judicial District of Tennessee, )<br><br>*Defendants*. ) | Case No. _____<br><br>**JURY DEMAND** |

## VERIFIED COMPLAINT

COME NOW THE PLAINTIFFS JULIE WERNERT and SCOTT WERNERT, as next friends for C.W., and file this complaint against the Defendants WILLIAMSON COUNTY BOARD OF EDUCATION and STACEY EDMONDSON, in her official capacity as District Attorney for the 21st Judicial District of Tennessee.

## I.
## Introduction

1. The minor plaintiff is a minor child who resides in Williamson County, Tennessee and, during the 2022-24 school year, was enrolled in the Williamson County school system. He was criminally prosecuted by District Attorney Stacey Edmondson's Office, placed in solitary confinement, strip searched, forced to undergo psychological evaluations, placed under strict court-ordered supervision and house arrest. He was humiliated before his peers, deprived of access to his classes and curriculum, and made to suffer other indignities, including the loss of various rights and privileges, the loss of educational opportunities and had his academic standing forever

tarnished over the Defendants' misapplication of Tenn. Code Ann. § 39-16-517, for allegedly communicating a Threat Level 1 in violation of Williamson County School Board policy.

2. Julie Wernert and Scott Wernert are the natural parents of C.W. Together, they bring this action against the Williamson County Board of Education and Stacey Edmondson, in her official capacity as the District Attorney for the 21st Judicial District of Tennessee.

3. Tenn. Code Ann. § 39-16-517, as amended by Public Chapter 727 (2024), authorizes criminal prosecution of persons who threaten to commit an act mass violence on school property, or at a school-related activity, but only in cases in which a reasonable person would conclude could lead to the serious bodily injury or death of two (2) or more persons.

4. The words "threat" or "threaten" are nowhere defined in Tenn. Code Ann. § 39-16-517, and the lack of an intent element leaves a child who utters anything that can be even remotely construed as a "threat" vulnerable to criminal prosecution and other dire consequences.

5. None of the speech attributed to any of the minor plaintiff rose to the level of a credible threat of mass violence or amounted to actions "that a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons", as set forth in Tenn. Code Ann. § 39-16-517.

6. Plaintiffs seek declaratory judgment to declare Tenn. Code Ann. § 39-16-517 and other relief arising out of the corollary enforcement of Williamson County Board of Education's WCS Board Policy 6.309 unconstitutional, as applied to their son.

7. Plaintiffs further seek compensatory damages under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-205, against the Defendant Williamson County Board of Education.

## II.
## Jurisdiction and Venue

8.     This Court has jurisdiction over the claims presented in this action pursuant to 28 U.S.C. § 1331, because this action presents a federal question involving the enforcement of constitutional rights under the United States Constitution.

9.     Venue is proper in the Middle District of Tennessee because all of the actions giving rise to these claims occurred within this federal district.

## III.
## Parties

10.     Julie Wernert is an adult citizen and resident of Williamson County, Tennessee.  She is the natural mother of C.W., a minor child.

11.     Scott Wernert is an adult citizen and resident of Williamson County, Tennessee, and is the natural father of C.W.

12.     The Defendant Williamson County Board of Education is a public board of education organized and existing under the laws of the State of Tennessee.

13.     The Defendant Stacey Edmondson is the District Attorney for the 21st Judicial District of Tennessee.  She is sued in her official capacity only. She may be served with process care of Attorney General of the State of Tennessee.

14.     Because the Plaintiffs challenge the constitutionality of a state statute, as applied, (specifically Tenn. Code Ann. § 39-16-517), notice is given to the Attorney General of the State of Tennessee, pursuant to Rule 5.1 Tenn.R.Civ.P.

## IV.
## Facts
## Recent Changes in the Law

15.   Tenn. Code Ann. § 49-6-3401(g) lists the various offenses that when committed by a student require a mandatory calendar year expulsion. These offenses are referred to as zero tolerance offenses.

16.   Prior to April 28, 2023, there were three zero tolerance offenses under Tenn. Code Ann. § 49-6-3401(g)(2): (A) A student brings to school or is in unauthorized possession on school property of a firearm, as defined in 18 U.S.C. § 921; (B) A student commits aggravated assault as defined in § 39-13-102 or commits an assault that results in bodily injury as defined in § 39-13-101(a)(1) upon any teacher, principal, administrator, any other employee of an LEA, or a school resource officer; or (C) A student is in unlawful possession of any drug, including any controlled substance, as defined in §§ 39-17-402 — 39-17-415, controlled substance analogue, as defined by § 39-17-454, or legend drug, as defined by § 53-10-101, on school grounds or at a school-sponsored event.

17.   Effective on July 1, 2023, (following the horrific shooting at Covenant School in Nashville on March 27, 2023), the Tennessee General Assembly amended Chapter 299 of the Public Acts of 2023, to add, as a zero tolerance offence under Tenn. Code Ann. § 39-16-517, threats of mass violence on school property.

18.   Tenn. Code Ann. § 39-16-517, provides as follows:

**Tenn. Code Ann. § 39-16-517. Threats of school-related mass violence; offenses and penalties**

(a)  As used in this section:

(1) "Mass violence" means any act which a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons;

(2) "Means of communication" means direct and indirect verbal, written, or electronic communications, including graffiti, pictures, diagrams, telephone calls, voice over internet protocol calls, video messages, voice mails, electronic mail, social media posts, instant messages, chat group posts, text messages, and any other recognized means of conveying information;

(3) "School" means any public or private elementary school, middle school, high school, college of applied technology, postsecondary vocational or technical school, or two-year or four-year college or university; and

(4) "School property" means any school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any local education agency, private school board of trustees, or directors for the administration of any school.

(b) A person who recklessly, by any means of communication, threatens to commit an act of mass violence on school property or at a school-related activity commits a Class A misdemeanor.

(c) As a condition of bail or other pretrial release, the court may, in its discretion, order the defendant to undergo an evaluation, under § 33-7-301, to determine whether the defendant poses a substantial likelihood of serious harm to the person or others.

(d)(1) Any person who has knowledge of a threat of mass violence on school property or at a school-related activity shall report the threat immediately to:

(A) The local law enforcement agency with jurisdiction over the school property or school-related activity; and

(B) The school that is subject to the threat of mass violence.

(2) The report must include, to the extent known by the reporter, the nature of the threat of mass violence, the name and address of the person making the threat, the facts requiring the report, and any other pertinent information.

(3) Any person who has knowledge of a threat of mass violence on school property or at a school-related activity and knowingly fails to report the threat commits a Class B misdemeanor.

(d)  In addition to any other penalty authorized by law, a sentencing court may order a person convicted under subsection (b) to pay restitution, including costs and damages resulting from the disruption of the normal activity that would have otherwise occurred on the school property or at the school-related activity but for the threat to commit an act of mass violence.

19.   As stated, the new statute contains the  following definitions that are applicable to this new offense: (a) (1) "Mass violence" means any act which would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons; (2) "Means of communication" means direct and indirect verbal, written, or electronic communications, including graffiti, pictures, diagrams, telephone calls, voice over internet protocol calls, video messages, voice mails, electronic mail, social media posts, instant messages, chat group posts, text messages, and any other recognized means of conveying information; (3) "School" means any public or private elementary school, middle school, high school, college of applied technology, postsecondary vocational or technical school, or two-year or four-year college or university; and (4) "School property" means any school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any local education agency, private school board of trustees, or directors for the administration of any school. (emphasis added).

20.   Following the enactment of Tenn. Code Ann. § 39-16-517, WCS amended its zero tolerance policy to add the following provision:

> THREATS OF SCHOOL-RELATED MASS VIOLENCE. Students shall not, by any means of communication, threaten to commit an act of mass violence on school property or at a school-related activity. "Mass violence" means any **act which a reasonable person would conclude** could lead to the serious bodily injury or the death of two (2) or more persons.

> "Means of communication" means direct and indirect verbal, written, or electronic communications, including graffiti, pictures, diagrams, telephone calls, voice over internet protocol calls, video messages, voice mails, electronic mail, social media posts, instant messages, chat group posts, text messages, and any other recognized means of conveying information. "School property" means any school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any local education agency, private school board of trustees, or directors for the administration of any school.

All local education agencies and public charter schools should work with their local attorneys to ensure policies, procedures, and parent and student handbooks are revised to include this change in the law prior to the beginning of the 2023-24 school year. (emphasis added).

### Facts Pertaining to Wernert Family

21.   On September 11, 2023, C.W. was enrolled as a junior at Independence High School in Thompson Station, Tennessee.

22.   During his 5th period chemistry class, C.W. was assigned to Kaylee Kollenborn's class.

23.   C.W. was seated at the front of the class at a table with three other students, and was at all times in close proximity to, and within hearing distance of his teacher, Ms. Kollenborn.

24.   Following a class experiment, Ms. Kollenborn opened the class for questions and discussion regarding the topic of school safety.

25.    One student asked: "What happens and where do we go if there is a bomb threat?"

26.   Another student brought up the possibility of some act of aggression by North Korea, and C.W. asked "why would North Korea be involved?"

27.   At one point, Ms. Kollenborn said satirically: "if we keep talking about bomb threats, someone is going to get arrested."

28.   Later that afternoon, near the end of C.W.'s 6th period Language class, Assistant Principal Naomi Williams and two SRO officers removed C.W. from the classroom. The SRO officers searched his backpack. Ms. Williams began questioning C.W. about what happened during his 5th period class with Ms. Kollenborn. C.W. asked what she meant, and whether he was in any trouble. Ms. Williams said that he was not in trouble.

29.   While Ms. Williams was speaking with C.W., Principal Nikki Patton approached and began yelling at C.W. about how he raised his hand earlier in Ms. Kollenborn's class, insinuating that it was a "Hitler salute". She insisted that the SRO Officers interview Ms. Kollenborn. The

Officers did as instructed, but returned saying that Ms. Kollenborn did not see or hear anything inappropriate by C.W. At this point, Nikki Patton shouted: **"I don't care; I want him arrested!"**

30.     C.W. was promptly placed under arrest and handcuffed. No one told C.W. the nature of the criminal charge against him or read him any Miranda warning.

31.     C.W. was taken to the Juvenile Detention Center. There he was strip searched and placed in solitary confinement. When he asked to speak with his parents or an attorney, both requests were summarily denied.

32.     On September 11, 2023, Julie Wernert received a telephone call from Assistant Principal Naomi Williams at Independence High School in Thompson Station, Tennessee. Ms. Williams said: "I'm sorry, but we had C.W. arrested. He made some sort of threat, raised his hand like Hitler and said something about North Korea, so we had him arrested."

33.     Several hours later, Scott Wernert received a call from Juvenile Detention advising him that C.W. was in lock up, and that it would be 24 hours before he could see or speak with his son.

34.     Ms. Wernert was advised that a counselor with Youth Villages would be meeting with C.W., and they agreed to meet with this counselor later that evening to check on their son's wellbeing. When the Wernerts met her at Juvenile Detention, the counselor urged the juvenile authorities to let them see their son, but they refused.

35.     On September 14, 2023, C.W. appeared at a Juvenile Detention hearing before Referee Jacques H. Cabell. The court issued an In-Home Detention Order and imposed the following punishment and restrictions:

It is, therefore, **ORDERED, ADJUDGED AND DECREED** that:

1. The child shall be released to Julie Wernert (Mother - Legal Custody) and Scott Wernert (Father - Legal Custody).
2. The child shall be placed on in-home detention (house arrest), except when attending school or court-approved employment. The child shall remain inside his residence with no contact of any kind with the outside or non-residents of that household.
3. The child shall submit to an outpatient evaluation pursuant to T.C.A. § 37-1-128(e)(1) on October 31, 2023 at 1:30 PM.
4. The child shall be subject to a School Search Order (see separate order).
5. Pursuant to TCA 37-1-128, an intensive probation officer shall be assigned to the case for safety monitoring. While under this supervision, the youth shall be subject to regular visits, random drug screens, and GPS monitoring (at the daily rate of $6.25). These interventions may be initiated and terminated at the discretion of the intensive probation officer. Failure to successfully comply with these conditions could result in a motion to revoke the conditions of a detention release order. These pre-adjudication interventions shall not be used as evidence during the youth's adjudicatory proceeding.
6. The child and family shall comply with a safety sweep of the home.
7. This matter shall be scheduled for Appearance on November 9, 2023 at 9:00 AM for which the child and parent, guardian, or legal custodian(s) shall appear.

36. In addition, the Court imposed the following additional In-Home Detention Rules:

## WILLIAMSON COUNTY JUVENILE COURT
## IN-HOME DETENTION ORDER

1. To be in your home at all times except (see exceptions).
2. If not at home, child must be in the presence of his/her parent or custodian(s).
3. You may not have friends visiting your home while on in-home detention.
4. Electronics and cell phone use may be restricted by parents.
5. You are not to use or access the internet except for schoolwork and only if supervised by a parent.
6. You may ride the school bus or be transported by a parent to school. You may not drive on in-home detention.
7. Juvenile Court must be provided with a telephone number that is in service and must be notified immediately if the telephone is disconnected, changed or out of service.

**EXCEPTIONS:**

School: **Independence High School**

With Parents(s) or Legal Custodian(s): **Julie Wernert (Mother – Legal Custody) and Scott Wernert (Father – Legal Custody)**.

37. C.W. was placed under house arrest and ordered to undergo psychiatric evaluation at Rolling Hills Hospital. The Wernerts were later advised by Rolling Hills that under the facts of C.W.'s case, he did not qualify for treatment.

38.   In the meantime, a supervisor with Youth Villages contacted Principal Nikki Patton at Independence High School to inquire about C.W.'s criminal charge and was advised by Principal Patton that was not able to explain why C.W. was arrested.

39.   Anna Urban, a Youth Officer advised the Wernerts that before any action was taken to arrest C.W., his parents, Dr. Nikki Patton and the school guidance counselor, Caitland Sharp, were supposed to conduct a meeting.

40.   On September 14, 2023, the Wernerts and C.W. attended a meeting at Independence High School with Dr. Nikki Patton.   When they questioned Dr. Patton about what factual investigation, if any, had been conducted prior to their son's arrest, Dr. Patton became very defensive and agitated.   She did confirm, however, that Ms. Kollenborn did not see or hear C.W. say or do anything inappropriate.   She also demonstrated with a raised hand how C.W. allegedly made a "Hitler salute", but offered no evidence from anyone who witnessed him make such a gesture.   At the end of the meeting, she advised the Wernerts that C.W. was being transferred to ALC for 180 days.

41.   In December of 2023, C.W. met with a court-appointed psychiatrist.   During this interview, the psychiatrist stated that he had conducted similar interviews with 50 students since school started in the fall of 2023, and that none of these students, including C.W., should have been arrested.

42.   On February 23, 2024, C.W. was released from ALC.

43. As a consequence of the Williamson County Board of Education's ("WCBOE'") treatment of C.W., as described herein, and his arrest, strip search, solitary confinement, house arrest, isolation and alienation, he has suffered, and continues to suffer severe and serious emotional injury and PTSD symptoms.

**Williamson County Schools' Failure to Follow**
**Its Threat Assessment Policy**

44. On July 13, 2023, Williamson County Schools updated its "WCS Threat Assessment Flowchart".

45. The Williamson County Schools' Threat Assessment Flowchart is a critical tool for investigating threats of mass violence, and determining the proper response. Essentially, this Flowchart screens those threats which rise to the level punishable under T.C. A. §39-16-517, and those that are not.

46. As shown below, Williamson County Schools failed to follow its own Threat Assessment Flowchart in this case as to C.W.

47. WCS' stated the purpose of this Flowchart is: "to identify circumstances that may increase the risk for potential violence and to assist school staff in developing a safety and supervision plan."

48. Step One of the Threat Assessment Flowchart explains the initial investigation process to be followed.



**Mitigate threat:**
- Take immediate action to protect students, employees and visitors (ALICE if necessary).
- Supervise and isolate student as needed.
- Notify SRO and the supervising Assistant Superintendent as appropriate.
- Obtain a specific account of the threat by interviewing the student who made the threat, the recipient of the threat and other witnesses.
- Attempt to have 2 adults in this interview process. Document the exact content of the threat and statements made by each party. Obtain written statements from all parties involved.

49.  Step two calls for administrators to determine whether the threat is a Level 1, 2 or 3.



- Involve the team as appropriate
- The preponderance of evidence helps determine the level of threat (levels 1-3)

50.  Step three of the Threat Assessment Flowchart states: Determine whether it is a <u>singular threat</u> or a <u>threat of mass violence</u>.

51.  Under the Williamson County Schools Threat Assessment policy, there are 3 distinct levels of threats: Level 1, Level 2 and Level 3.  (A true and correct copy of Williamson County Schools' Threat Assessment Flowchart is attached hereto as **Exhibit A**, and is incorporated herein by reference).

52.  C.W.  was cited with only a Threat Level 1 violation of this new school board policy, which according to the WCS Threat Assessment flow chart is the lowest level of threat and does not rise to the level of a threat of mass violence (Level 3).



53. The proper WCS protocol for a Threat Level 1, under Step 3(a) is set forth below:



3a. Response to Level 1

- Communicate disposition to Assistant Superintendent as directed
- Notify student's parents and intended victims' parents to the extent allowed by FERPA
- Implement discipline (consider IEP/504 regulations)
- Enter incident into Skyward
- Refer to a WCS school counselor
- Refer to WCS social worker as needed for resources
- Continue to monitor behavior

54. Importantly, under WCS' own policy and Threat Assessment Flowchart, only a Level 3 threat calls for the threat to be reported. (See Exhibit A, Level 3).

55. WCS failed to follow its' own policy and Threat Assessment Flowchart as described above for C.W., and this failure subjected him to serious and severe emotional injuries, unnecessary criminal prosecution, denial of access to education, and denial of substantive due process.

56. As District Attorney for the 21st Judicial District of Tennessee, Stacey Edmondson, acting in her official capacity, approved and authorized the prosecution of C.W. under Tenn. Code Ann. § 39-16-517 based on his conduct as described herein.

57. As the District Attorney for the 21st Judicial District, Stacey Edmondson is responsible for prosecuting criminal offences under Tenn. Code Ann. § 39-16-517 that allegedly occur in Williamson County, Tennessee. Tenn. Code Ann. § 8-7-103.

58. The criminal prosecution of C.W. and the injuries and indignities he suffered as a direct result thereof, were authorized and carried out under the direction and control of the Defendant Stacey Edmondson acting in her official capacity as the District Attorney for the 21st Judicial District of Tennessee.

59. As the chief criminal prosecutor for Williamson County, Tennessee, District Attorney Stacey Edmondson is responsible for determining whether reports of a minor's threat of mass violence under Tenn. Code Ann. § 39-16-517 are credible and deserving of the severe sanctions and penalties applicable under this state criminal statute.

**V.**
**Causes of Action**

**COUNT I**
**42 U.S.C. § 1983**
**Violation of Fourteenth Amendment Due Process As-Applied**

60. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs and do further allege as follows.

61. Students enjoy a property interest in their public high school and middle school education under Tennessee law. See *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

62. A student's interest is "to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences." *Id*. at 579, 95 S.Ct. 729.

63. C.W. was falsely accused of a Threat Level 1 mass violence violation.

64. C.W. was criminally prosecuted pursuant to Tenn. Code Ann. § 39-16-517.

65. None of C.W.'s actions rose to the level of a credible threat of mass violence, as that offense is set forth in Tenn. Code Ann. § 39-16-517.

66. Specifically, none of C.W.'s actions were acts "which a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons."

67. The application of Tennessee's Mass Violence statute, Tenn. Code Ann. § 39-16-517, to the minor plaintiff's conduct in this case was arbitrary and capricious sand constitutes a denial of their right to due process under the Fourteenth Amendment.

68. The word "threat" is not defined in Tenn. Code Ann. § 39-16-517. The lack of an intent element leaves anyone who says anything that can be even remotely construed as a "threat" vulnerable to criminal and other consequences.

69. As a consequence of the application of Tennessee's Mass Violence statute to C.W., he suffered injuries including by illustration and not by limitation the following: He was criminally prosecuted, suspended, humiliated before his peers, deprived of access to his classes and curriculum, strip searched, forced to undergo a psychiatric evaluation, and placed on house arrest. C.W. suffered other indignities, including the loss of various rights and privileges, and his academic standings have been forever tarnished.

**COUNT II**
**42 U.S.C. § 1983**

**Denial of Substantive Due Process**
**Williamson County Board of Education**

70. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs and do further allege as follows.

71. Schools deprive a student of a property interest in education when it is shown that the education received at the alternative school is significantly different from or inferior to that received at his regular public school," *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996).

72. The Williamson County Alternative Learning Center ("ALC") is operated by the Williamson County Board of Education.

73. The ALC is designed to be punitive in nature and is located at the Williamson County Juvenile Justice Center, a correctional facility which houses pre-trial detainees and those convicted of crimes, including violent offenders.

74. Students consigned to the ALC are required, as a part of their daily routine, to line up outside of the ALC entrance before 8:00 a.m. where they are exposed to the elements. Once allowed to enter the facility, they are made to remove their belts and walk through a metal detector. Then then are searched, ordered to pull all of their pockets inside out, stick out their tongues. They are subjected to random searches at which times they are instructed to take off their shoes and roll their socks down to their toes.

75. The classes offered at ALC are not the normal type of classes the minor plaintiffs attended at WCS schools. Course materials and class assignments lag far behind those offered at the plaintiffs' traditional WCS schools.

76. The minor plaintiff was forced to concentrate on his Chromebook and self-learn his usual assignments while the teacher and other students in the classroom discussed completely different material. C.W. suffered scholastically due to his inability to take examinations in a timely manner, ask questions in class or interact with the teacher and his classmates.

77. The educational setting at ALC is chaotic and disruptive. Classroom instruction is repeatedly disrupted when teachers and staff have to routinely remove individuals from the room due to misconduct and disrespect toward the instructor.

78. The minor plaintiff did not receive the hand-outs and other learning aids that his student peers in his assigned WCS school classes received. He was therefore handicapped in his ability to compete with other students or to maintain acceptable grades and scoring on examinations.

79. ALC is not an educational institution; it is penal in nature.

80. As a consequence of being wrongfully accused of threats of mass violence and denied access to their course of instruction at WCS schools, the C.W. was deprived of his property interest in education.

81. C.W. also suffered emotional injury and mental anguish, humiliation and was subjected to searches and/or other indignities for which he is entitled to an award of compensatory damages.

### COUNT III

**Governmental Tort Liability Act**
**Tenn. Code Ann. § 29-20-205**
**Negligent Infliction of Emotional Distress**

**Williamson County Board of Education**

82. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs and do further allege as follows.

83. The Williamson County Board of Education, acting through its school administrators, owed a duty to C.W. to enforce its disciplinary rules consistently and fairly and thus in conformity with state statutes governing student discipline.

84. Tennessee's Governmental Tort Liability Act does not immunize the WCBOE from liability for negligent infliction of emotional distress.

85. Tennessee's statute codified at Tenn. Code Ann. § 39-16-517 does not deprive WCBOE school officials from exercising reasonable discretion in determining whether a student's alleged conduct poses a realistic threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

86. The WCBOE, acting through its administrators breached its duty of care owed to C.W. by arbitrarily applying its zero tolerance policy in a manner that failed to take into account whether C.W.'s alleged speech reasonably constituted a threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

87. The Defendant, WCBOE, was negligent in its application of the zero-tolerance standard under Tenn. Code Ann. § 39-16-517, and adopted instead a policy or practice of routinely referring students to criminal prosecution when their speech in no way constituted a realistic threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

88. Specifically, Superintendent Jason Golden's espoused position that he had "all the power and was the only one with the authority to possibly reduce the zero tolerance, one year suspension" was an arbitrary abuse of governmental authority and demonstrated the Defendant's lack of individualized care owed to C.W. in the determination of whether his speech constituted a realistic threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

89. The Defendant WCBOE's duty to enforce its disciplinary rules consistently and fairly and thus in conformity with state statutes governing student discipline was particularly heightened given the dire consequences C.W. faced when referred for criminal prosecution under Tenn. Code Ann. § 39-11-106, and the attendant consequences on this child both emotionally and educationally.

90. As a direct and proximate result of the Defendant WCBOE's breach of its duty of care owed to C.W., he suffered serious and severe emotional injuries, including but not limited to, mental anguish, humiliation, embarrassment, loss of enjoyment of life and other indignities for which they are entitled to an award of compensatory damages.

WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS SEEK THE FOLLOWING RELIEF:

1. That process issue to the Defendant Stacey Edmondson, in her capacity as District Attorney for the 21st Judicial District of Tennessee, c/o the Attorney General of the State of Tennessee, requiring her to respond to this Complaint within the time required under the Federal Rules of Civil Procedure;

2. That process issue to the Defendant Williamson County Board of Education requiring it to respond to this Complaint within the time required under the Federal Rules of Civil Procedure;

3. That at the trial of this case the court enter an order pursuant to 28 U.S.C. § 2201 declaring that the Defendant District Attorney Edmondson's prosecution and continued enforcement of Tenn. Code Ann. § 39-16-517, as applied to C.W. is unconstitutional as a violation of these plaintiff's substantive due process rights under the Fourteenth Amendment of the United States Constitution;

4. That at the trial of this case the court enter an order declaring the Defendant Williamson County Board of Education's application of its Policy No. 6.309, as applied to the minor Plaintiff, unconstitutional as a violation of C.W.'s substantive due process rights under the Fourteenth Amendment of the United States Constitution;

5. That at the trial of this case the court enter an order declaring the Defendant Williamson County Board of Education's punitive assignment and transfer of C.W. to the Alternative Learning Center an unconstitutional denial of these Plaintiff's property rights in education;

6. That the Plaintiffs be awarded nominal damages;

7. That Plaintiff C.W. be awarded compensatory damages against Williamson County School Board in the amount of Three Hundred Thousand Dollars ($300,000.00);

8. That the Plaintiffs be awarded reasonable attorney's fees;

9. That the Plaintiffs have and recover such further and general relief as to which they may be entitled, including the costs of this cause.

10. That a jury of six be empaneled to hear and try all issues of fact presented.



_____
Julie Wernert

STATE OF TENNESSEE    )
COUNTY OF WILLIAMSON    )

      Personally appeared before me, _LARRY L. CRAN_, a notary public in and for said County and State, the above-signed, Julie Wernert, and did make oath that the information contained in the foregoing Verified Complaint is true and correct to the best of her information, knowledge and belief.

      Sworn to and subscribed before me this _16th_ day of _____, 2024.

                              _____
                           Notary Public

My commission expires: _7-6-2026_

LARRY L. CRAN
STATE OF
TENNESSEE
NOTARY
PUBLIC
DAVIDSON COUNTY
My Commission Expires
July 06, 2026

Respectfully submitted,

**CRAIN LAW GROUP, PLLC**

By: */s/ Larry L. Crain*
Larry L. Crain (#9040)
5214 Maryland Way, Suite 402
Brentwood, TN. 37027
Tel. 615-376-2600
Fax. 615-345-6009
Email: Larry@crainlaw.legal

Emily Castro, Tenn.Sup.Crt. # 028203
5214 Maryland Way, Suite 402
Brentwood, TN 37027
(615) 376-2600
Emily@Crainlaw.legal

*Counsel for Plaintiffs*